IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JOHN HORAN<br>6853 Talbot Drive<br>Parma, Ohio 44129<br><br>and<br><br>HEATHER WAGLEY<br>114 Signal Hill<br>Chagrin Falls, Ohio 44023<br><br>and<br><br>SONYA WASHINGTON<br>4471 Granada Boulevard<br>Apartment 105<br>Warrensville Heights, Ohio 44128<br><br>and<br><br>SANDRA HATIBOVIC<br>3318 Van Buren Drive<br>Brunswick, Ohio 44212<br><br>and<br><br>JOHNNY PARSONS<br>3318 Van Buren Drive<br>Brunswick, Ohio 44212<br><br>and<br><br>ANTOINETTE HORAN<br>6853 Talbot Drive<br>Parma, Ohio 44129<br><br>and<br><br>SAMANTHA HARRY<br>9291 Cherry Tree Drive<br>Apt. 207<br>Strongsville, Ohio 44136 | CASE NO. 1:18-cv-2054<br><br>JUDGE:<br><br>**COMPLAINT FOR INJUNCTIVE<br>RELIEF AND DAMAGES**<br><br>**(Jury Demand Endorsed Hereon)** |

|  |  |
|---|---|
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| UNIVERSITY HOSPITALS HEALTH | ) |
| SYSTEM, INC. | ) |
| *dba* University Hospitals Parma Medical | ) |
| Center and University Hospitals Suburban | ) |
| Health Center | ) |
| c/o Janet L. Miller, Statutory Agent | ) |
| 3605 Warrensville Center Road | ) |
| Shaker Heights, Ohio 44122 | ) |
| | ) |
| and | ) |
| | ) |
| UNIVERSITY HOSPITALS AHUJA | ) |
| MEDICAL CENTER, INC. | ) |
| c/o Janet L. Miller, Statutory Agent | ) |
| 3605 Warrensville Center Road | ) |
| Shaker Heights, Ohio 44122 | ) |
| | ) |
| and | ) |
| | ) |
| UNIVERSITY HOSPITALS MEDICAL | ) |
| GROUP, INC. | ) |
| c/o Janet L. Miller, Statutory Agent | ) |
| 3605 Warrensville Center Road | ) |
| Shaker Heights, Ohio 44122 | ) |
| | ) |
| and | ) |
| | ) |
| UNIVERSITY HOSPITALS CLEVELAND | ) |
| MEDICAL CENTER | ) |
| c/o Janet L. Miller, Statutory Agent | ) |
| 3605 Warrensville Center Road | ) |
| Shaker Heights, Ohio 44122 | ) |
| | ) |
| and | ) |
| | ) |
| UNIVERSITY PRIMARY CARE | ) |
| PRACTICES, INC. | ) |
| c/o Janet L. Miller, Statutory Agent | ) |
| 3605 Warrensville Center Road | ) |
| Shaker Heights, Ohio 44122 | ) |
| | ) |
| Defendants. | ) |

2

Plaintiffs John Horan, Heather Wagley, Sonya Washington, Sandra Hatibovic, Johnny Parsons, Antoinette Horan, and Samantha Harry, by and through undersigned counsel, as their Complaint against Defendants University Hospitals Health System, Inc., University Hospitals Ahuja Medical Center, Inc., University Hospitals Medical Group, Inc., University Hospitals Cleveland Medical Center, and University Primary Care Practices, Inc. (collectively "Defendants" or "University Hospitals"), state and aver the following:

## INTRODUCTION

1. This lawsuit is brought against University Hospitals to remedy a continuing policy, pattern, or practice of unlawfully discriminating against Deaf and hard of hearing patients and family members who seek healthcare services at University Hospitals. Effective communication in a healthcare facility is of paramount importance to ensure that medical care plans and decisions are properly implemented. Effective communication is necessary to ensure the doctors, nurses, and other medical professionals can fully understand the information patients and their family members are trying to express about their health condition, to ensure that patients and family members can fully understand the information and advice that such medical professionals are trying to provide, and to ensure that fully informed decisions can be made about care for often complex medical conditions. Lack of prompt and effective communication access can result in a host of harms, ranging from inadequate healthcare treatment to injury or death.

2. Compliant policies and procedures for the provision of effective communication for Deaf and hard of hearing persons in a healthcare facility will require a range of communication aids and services be made available, including qualified sign language interpreters. Healthcare providers must develop and implement policies and procedures to ensure that the patient's

desired form of communication is given primary consideration, and that the ultimate communication method only strays from that request when it is determined to cause an undue burden or fundamental alteration to the service.

3. Qualified American Sign Language ("ASL") interpreters must be made readily available for those patients and family members who need such aide and services. Providing effective communication also requires that alternative methods be utilized when it is infeasible to obtain an on-site, qualified ASL interpreter immediately or when urgent information must be transmitted before a qualified interpreter has arrived on site. Such alternative measures include technologies such as Video Remote Interpreting ("VRI"), through which a qualified ASL interpreter located off-site is immediately available through internet video communications. For VRI to be effective as an interim measure, the medical facility must have in place adequate hardware; software; internet speed, coverage, and reliability; proper training for all staff on the use of the VRI. In general, VRI will not be sufficient to provide effective communication in medical settings apart from facilitating interim communications.

4. Effective communication also requires that medical providers adopt and/or modify various policy and practices so that systems that ordinarily require hearing, such as patient intercom systems, are not barriers to equal access.

5. University Hospitals has repeatedly violated these requirements for effective communication with Deaf and hard of hearing patients and family members. University Hospitals has written policies in place that not only fail to require the use of on-site ASL interpreters, but also direct University Hospitals' staff that passing notes and lip reading are acceptable means of communication with Deaf and hard of hearing patients and family members. Deaf and hard of hearing patients and family members at University Hospitals have routinely been denied

ASL interpreters, have been required to use family members as ASL interpreters, have been denied the use of effective VRI technology, have been forced to communicate by passing notes and reading lips, have been subjected to unequal and demeaning treatment due to their hearing disabilities, and have been refused necessary and reasonable modifications to policies and procedures.

6. Such barriers result in Deaf and hard of hearing patients and family members suffering discriminatory conditions at University Hospitals. The result is that Deaf and hard of hearing patients and family members experience difficulty communicating with medical staff as well as hardship, anxiety, and danger. Equal access to healthcare is a basic right under federal and state civil rights laws. This lawsuit seeks to correct this discriminatory situation for all Deaf and hard of hearing persons subjected to such unacceptable conditions.

7. Federal laws were enacted to ensure that persons with disabilities receive equal access to services of public and private entities including access to healthcare services. *See* 29 U.S.C. § 794 (Section 504 of the Rehabilitation Act of 1973 ("Section 504")); 42 U.S.C § 12101(a)(7) (Americans with Disabilities Act ("ADA")); 42 U.S.C. § 18116 (Section 1557 of the Patient Protection and Affordable Care Act ("ACA")). Defendants have excluded Plaintiffs from participation in and denied them the benefits of the healthcare programs and services offered at University Hospitals. The violations at issues include: a) failing to provide qualified on-site ASL interpreters and effective VRI as necessary auxiliary aids or services; b) failing to provide such necessary auxiliary aids or services in a timely manner; c) failing to sufficiently train staff regarding the provision of effective communication to individuals who have hearing disabilities; and d) failing to create and implement policies to ensure effective communication for individuals with hearing disabilities.

8. Plaintiff bring this action to remedy violations of Title III of the ADA, 42 U.S.C. §§ 12181, *et seq.* and its accompanying regulations; Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 794, *et. seq.* and its accompanying regulations; and Section 1557 of the ACA, 42 U.S.C. § 18116.

## JURISDICTION AND VENUE

9. This Court has original jurisdiction over the action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367 for Plaintiffs' claims arising under Title III of the ADA, 42 U.S.C. § 12181; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and Section 1557 of the ACA, 42 U.S.C. § 18116.

10. Venue is properly in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2) because (a) Defendants are located in this judicial district, and (b) a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred within this judicial district.

## PARTIES

11. Plaintiff John Horan lives in Parma, Ohio, less than one mile from University Hospitals Parma Medical Center. Mr. Horan is Deaf and uses ASL as his primary method of communication. Mr. Horan is an "individual with a disability" within the meaning of all applicable statutes and regulations. Mr. Horan has previously sought medical services at University Hospitals and would use the healthcare services of University Hospitals again if such services were made accessible to him.

12. Plaintiff Heather Wagley lives in Chagrin Falls, Ohio, approximately 20 miles from University Hospitals Suburban Health Center. Ms. Wagley is Deaf and uses ASL as her primary method of communication. Ms. Wagley is an "individual with a disability" within the meaning of all applicable statutes and regulations. Ms. Wagley has previously sought

medical services at University Hospitals and would use the healthcare services of University Hospitals again if such services were made accessible to her.

13. Plaintiff Sonya Washington lives in Warrensville Heights, Ohio, less than three miles from University Hospitals Ahuja Medical Center. Ms. Washington is Deaf and uses ASL as her primary method of communication. Ms. Washington is an "individual with a disability" within the meaning of all applicable statutes and regulations. Ms. Washington has previously sought medical services at University Hospitals and would use the healthcare services of University Hospitals again if such services were made accessible to her.

14. Plaintiff Sandra Hatibovic lives in Brunswick, Ohio, sixteen miles from University Hospitals Parma Medical Center. Ms. Hatibovic is Deaf and uses ASL as her primary method of communication. Ms. Hatibovic is an "individual with a disability" within the meaning of all applicable statutes and regulations. Ms. Hatibovic has previously sought medical services at University Hospitals and would use the healthcare services of University Hospitals again if such services were made accessible to her.

15. Plaintiff Johnny Parsons lives in Brunswick, Ohio, sixteen miles from University Hospitals Parma Medical Center. Mr. Parsons is Deaf and uses ASL as his primary method of communication. Mr. Parsons is an "individual with a disability" within the meaning of all applicable statutes and regulations. Mr. Parsons has previously sought medical services at University Hospitals and would use the healthcare services of University Hospitals again if such services were made accessible to him.

16. Plaintiff Antoinette Horan lives in Parma, Ohio, less than one mile from University Hospitals Parma Medical Center. Ms. Horan is Deaf and uses ASL as her primary method of communication. Ms. Horan is an "individual with a disability" within the meaning of all

applicable statutes and regulations. Ms. Horan has previously sought medical services at University Hospitals and would use the healthcare services of University Hospitals again if such services were made accessible to her.

17. Plaintiff Samantha Harry lives in Strongsville, Ohio, less than eight miles from University Hospitals Parma Medical Center. Ms. Harry is Deaf and uses ASL as her primary method of communication. Ms. Harry is an "individual with a disability" within the meaning of all applicable statutes and regulations. Ms. Harry has previously sought medical services at University Hospitals and would use the healthcare services of University Hospitals again if such services were made accessible to her.

18. Defendants University Hospitals Health System, Inc., University Hospitals Ahuja Medical Center, Inc., University Hospitals Medical Group, Inc., University Hospitals Cleveland Medical Center, and University Primary Care Practices, Inc. are for-profit corporations duly organized and existing pursuant to the laws of the state of Ohio. These corporations operate health care facilities under the "University Hospitals" brand located in Cuyahoga County, Ohio, and hold itself out to the public, including Plaintiffs, as a provider of medical care services.

19. There are a common and uniform set of policies and procedures that Defendants jointly implement.

20. University Hospitals Parma Medical Center and University Hospitals Suburban Health Center are registered trade names of Defendant University Hospitals Health System, Inc.

21. University Hospitals Rainbow Babies and Children's Hospital is a registered trade name of Defendant University Hospitals Cleveland Medical Center.

22. Each Defendant is a recipient of federal financial assistance, including Medicare and/or Medicaid reimbursements, and all Defendants are therefore subject to the requirements of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

## FACTS THAT APPLY TO ALL CLAIMS

23. Plaintiffs rely on ASL to effectively communicate with others.

24. ASL is a complete, complex language that employs signs made with the hands and other movements, including facial expressions and postures of the body. It is a language distinct from English – it is not simply English in hand signals – and has its own vocabulary and rules for grammar and discourse structure.

25. Because of the difficulty many Deaf individuals experience reading and writing the English language, passing notes back and forth is not an effective means of communication under the ADA, Section 504, and the ACA.

26. In general, lip reading is a very difficult and unreliable form of communication. It is extremely challenging to lip-read English because only a small fraction of the sounds used in speaking are clearly visible on the mouth and many sounds appear identical on the lips. In addition to the difficulties in lip reading, the ability to accurately lip-read is greatly affected by the speaker's accent, facial bone structure, facial musculature, facial hair, lighting, distance from the lip reader, and other external and uncontrollable factors. Lip reading in not an effective means of communication under the ADA, Section 504, and the ACA.

27. Defendants have instituted written policies, practices, and procedures regarding effective communication with Deaf and hard of hearing patients and family members.

28. The primary policy that Defendants have promulgated to their staff is titled "Policy and Procedure CP-53-Hearing or Sensory-Impaired Persons" ("UH Deaf Policy").

29. The UH Deaf Policy lists in its "Key Points" section that "Handwritten or Typewritten Notes" and "Lip reading" as options that are "available to hearing impaired patients and personal representatives at University Hospitals."

30. Section 6 of the UH Deaf Policy is titled "Handwritten Notes" and states that, "Handwritten or Typewritten Communications between the patient or patient's personal representative is acceptable."

31. Section 9 of the UH Deaf Policy provides that "Lip reading may be an agreed upon method of communication between the healthcare provider and the patient or patient's personal representative."

32. University Hospitals attempts to use VRI, however, its staff is not trained on how to use this equipment, and/or the video internet connection is inadequate to obtain a clear signal to effectively communicate.

33. As a result of Defendants' policies, practices, and procedures with regard to effective communication, Plaintiffs have been discriminated against and denied full and equal access to the benefits of Defendants' healthcare services.

34. Defendants have failed and are failing to provide qualified interpreters as a necessary auxiliary aid or service. Despite Plaintiffs' and other Deaf patients' immediate requests for interpreters upon arrival at University Hospitals and when scheduling medical appointments, Defendants do not give primary consideration to the requests of individuals with hearing disabilities and often fail to assess whether interpreting services are available at all.

35. Defendants have failed and are failing to train University Hospitals' staff regarding the provision of effective communication. As a result, doctors and staff treat patients with hearing disabilities different than other patients.

36. Defendants have failed and continue to fail to modify procedures such as standard appointment length and communication methods where necessary to prevent discrimination against people with hearing disabilities.

37. Defendants have failed and are failing to create and implement policies at University Hospitals to ensure effective communication for Plaintiffs and other individuals who are Deaf and hard of hearing.

38. Defendants' policy that allows for staff to communicate with Deaf and hard of hearing patients and family members by written notes or lip reading does not ensure effective communication.

39. In order to receive Medicaid funding, University Hospitals is required to develop policies and procedure that ensure that persons who are Deaf or hard of hearing will receive adequate and effective communication.

40. Each time University Hospitals recertifies for Medicaid funding, it promises that it will provide and adhere to such policies.

41. Upon information and belief, University Hospitals has not provided proper training on the treatment of patients who are hearing impaired.

42. While University Hospitals has access to qualified ASL interpreters in person and VRI, upon information and belief, University Hospitals staff have not had proper training on when they must utilize a qualified interpreter, nor is the process streamlined to ensure interpreting services are easily obtained in a timely manner.

43. Upon information and belief, University Hospitals staff have not been trained on effective communication with the Deaf of how to use VRI, and the machines are not kept in working order.

## EXPERIENCES OF THE PLAINTIFFS

### 1. John Horan

44. Mr. Horan is Deaf and ASL is his primary form of communication.

45. On or about June 9, 2017, Mr. Horan sought medical care at University Hospital Parma Medical Center.

46. Mr. Horan presented with a cough for several days with wheezing.

47. Mr. Horan was identified as Deaf.

48. Mr. Horan was communicated with by using lip reading and passed notes.

49. At no point was an on-site ASL interpreter nor VRI provided.

50. On or about January 18, 2018, Mr. Horan sought medical care at University Hospital Parma Medical Center.

51. Mr. Horan presented with a cough, chest pain and shortness of breath.

52. Mr. Horan and his wife were identified as both being Deaf.

53. At no point was an on-site ASL interpreter nor VRI provided. Instead, communication was done through passed notes.

54. On or about January 23, 2018, Mr. Horan sought medical care at University Hospital Parma Medical Center.

55. Mr. Horan was admitted to the Telemetry Floor after presenting to the Emergency Department with shortness of breath.

56. Mr. Horan was identified as being Deaf.

57. Following transfer from the Emergency Department, at no point was an on-site ASL interpreter nor VRI provided. Instead, communication was done through passed notes until his discharge on January 24, 2018.

58. On February 27, 2018, John Horan, Jr., Mr. Horan's hearing son, emailed Angela Davis, RN, requesting an on-site interpreter for his father's March 9, 2018 CT scan and surgical consultation with Dr. Basar Sareyyupoglu, MD.

59. Later that same day, Davis responded that "[w]e are not able to have an in-person interpreter. We have tried to accommodate for this in the past and the request was denied."

60. On March 1, 2018, Davis added "[j]ust wanted to make sure you know that for the appointment on 3/9 – we will use the Marti [VRI] system.  This is the main campus policy."

61. On March 13, 2018, Mr. Horan, Jr. emailed Davis regarding his father's upcoming cardiac catherization procedure.

62. Again, Mr. Horan, Jr. requested an on-site ASL interpreter for his father.

63. On March 14, 2018, Davis responded "I will not be able to get a personal interpreter.  I would like to talk with you about this as it went all the way up to our legal department. Let me know what time is good to talk."

64. John Jr. left a voicemail for Nurse Davis, where she responded in email stating "They are unable to have an in-person interpreter per our legal and compliance department review.  I am happy to discuss this further with you. I am sorry for this, I understand that the expectation was a live interpreter."

65. During Mr. Horan's cardiac catherization procedure, Mr. Horan was unable to see the VRI during his heart procedure.

66. During Mr. Horan's heart procedure, communication was done through passed notes.

67. During Mr. Horan's March 2018 cardiac catherization procedure, no effective communication was fostered between Mr. Horan and University Hospitals staff and doctors.

68. Due to Mr. Horan's continuing heart issues, he expects to visit University Hospitals consistently in the future.

## 2. Heather Wagley

69. Ms. Wagley is Deaf and ASL is her primary form of communication.

70. Ms. Wagley has epilepsy.

71. In or around February 2017, Ms. Wagley sought medical care at University Suburban Health Center.

72. Ms. Wagley made an appointment with her family doctor, Debora Anne DeJoseph, MD, and well in advance of the appointment, requested an on-site interpreter.

73. Upon arriving to her appointment, Ms. Wagley learned that no on-site interpreter had been obtained by University Hospitals.

74. While at her February 2017 appointment, University Hospitals failed to provide VRI or any other effective auxiliary aid.

75. At her February 2017 appointment, Dr. DeJoseph instead attempted to use Ms. Wagley's Deaf advocate as an ASL interpreter.

76. Ms. Wagley's Deaf advocate is not an ASL interpreter.

77. When deputizing Ms. Wagley's Deaf advocate as an ASL interpreter did not produce effective communication, Dr. DeJoseph began using passed notes to communicate with Ms. Wagley.

78. During her February 2017 appointment, Ms. Wagley was not provided the proper means to effectively communicate with her doctor and other health professionals.

79. In or around February 2018, Ms. Wagley sought medical care at University Suburban Health Center.

80. Ms. Wagley made an appointment with her family doctor, Suzana Sarac-Leonard, MD, and well in advance of the appointment, requested an on-site interpreter.

81. Upon arriving to her February 2018 appointment, Ms. Wagley learned that no on-site ASL interpreter had been obtained by University Hospitals.

82. While at her February 2018 appointment, University Hospitals refused to provide VRI or any other auxiliary aid.

83. At her February 2018 appointment, Dr. Sarac-Leonard instead attempted to use Ms. Wagley's Deaf advocate as an ASL interpreter.

84. Ms. Wagley's Deaf advocate is not an ASL interpreter.

85. When deputizing Ms. Wagley's Deaf advocate as an ASL interpreter did not produce effective communication, Dr. Sarac-Leonard began using written word to communicate with Ms. Wagley.

86. During her February 2018 appointment, Ms. Wagley was not provided the proper means to effectively communicate with her doctor and other health professionals.

87. On or about March 30, 2018, Ms. Wagley sought medical care at University Suburban Health Center.

88. Ms. Wagley made an appointment with her neurologist, Nuria Lacuey Lecumberri MD, and well in advance of the appointment, requested an on-site interpreter.

89. Ms. Wagley's March 30, 2018 appointment with Dr. Lecumberri was vitally important since Dr. Lecumberri was treating Ms. Wagley for epilepsy.

90. Upon arriving to her appointment, Ms. Wagley learned that no ASL interpreter had been obtained by University Hospitals.

91. While at her March 30, 2018 appointment, Dr. Lecumberri remarked that a VRI machine was "upstairs" but "we don't need an interpreter, we can do this just fine."

92. University Hospitals refused to provide VRI or any other auxiliary aid at the March 30, 2018 appointment despite those aids being readily available.

93. Dr. Lecumberri instead communicated with Ms. Wagley through typing on a Microsoft Word document.

94. Dr. Lecumberri attempted to communicate through written word with Ms. Wagley about important topics such as Ms. Wagley's seizures, whether Ms. Wagley can drive, and Ms. Wagley's prognosis regarding seizures moving forward.

95. Since University Hospitals refused to provide any ASL interpreter or auxiliary aid, Ms. Wagley was not able to effectively communicate with her doctor or other health professionals during her March 30, 2018 appointment.

96. Because of the ongoing nature of Ms. Wagley's conditions, including epilepsy, Mr. Wagley will consistently visit University Hospitals in the future.

### 3. Sonya Washington

97. Ms. Washington is Deaf and ASL is her primary form of communication.

98. On or about July 4, 2017, Ms. Washington sought medical care for her minor son, Eugene Washington, who is hard of hearing, at University Hospital Ahuja Medical Center.

99. Eugene Washington is 11 years of age.

100.    Eugene had fractured his arm.

101.    While VRI was provided, it quickly became distorted, lagged, and was unable to be used to foster effective communication.

102.   On information and belief, University Hospitals' staff had no way of contacting any technical support for the VRI when it was malfunctioning and admitted that they were not sure how to properly work VRI.

103.   When VRI malfunctioned, University Hospitals staff attempted to deputize Ms. Washington's 19-year-old daughter as an interpreter.

104.   Ms. Washington made clear that she was not comfortable having her daughter interpret and repeated her request for an ASL interpreter or auxiliary aid.

105.   No ASL interpreter or auxiliary aid was provided and University Hospitals instead passed notes to Ms. Washington regarding her son's medical care.

106.   During Ms. Washington's July 4, 2017 visit, no effective communication was fostered between Ms. Washington and University Hospitals staff and doctors.

107.   In or around November 2017, Ms. Washington sought medical care at University Hospital Ahuja Medical Center.

108.   Ms. Washington was experiencing severe back pain.

109.   Upon arriving, Ms. Washington requested an on-site interpreter or VRI to communicate with staff and doctors.

110.   University Hospitals refused to provide Ms. Washington an on-site ASL interpreter or VRI to communicate with staff and doctors during her November 2017 visit.

111.   Instead of providing an effective means of communication, University Hospitals attempted to deputize Eugene Washington to help interpret communications between Ms. Washington and University Hospitals staff and doctors.

112.   Ms. Washington made clear that she did not want her 11-year-old son acting as an ASL interpreter.

113.    University Hospitals resorted to passing notes to Ms. Washington to diagnose Ms. Washington's medical issues during her November 2017 visit.

114.    During Ms. Washington's November 2017 visit, no effective communication was fostered between Ms. Washington and University Hospitals staff and doctors.

115.    On or about May 26, 2018, Ms. Washington sought medical care at University Hospital Ahuja Medical Center.

116.    Ms. Washington sought medical care due to complications associated with her pregnancy.

117.    Upon arriving, Ms. Washington requested an on-site ASL interpreter or VRI to communicate with staff and doctors.

118.    University Hospitals attempted to utilize VRI, but the machine continually blacked out and was not operational.

119.    University Hospitals staff were unaware on how to properly operate the VRI.

120.    University Hospitals resorted to passing notes to Ms. Washington to diagnose Ms. Washington's medical issues during her May 26, 2018 visit.

121.    During Ms. Washington's May 26, 2018 visit, no effective communication was fostered between Ms. Washington and University Hospitals staff and doctors.

122.    On or about July 17, 2018, Ms. Washington sought medical care due to complications associated with her pregnancy.

123.    Upon arriving, Ms. Washington requested an on-site ASL interpreter or VRI to communicate with staff and doctors.

124.    University Hospitals attempted to utilize VRI, but the machine continually blacked out and was not operational.

125.    University Hospitals attempted to pass notes to communicate.

126.    Due to Ms. Washington's limited English proficiency, she was unable to understand the medical information that was being conveyed to her.

127.    During Ms. Washington's July 17, 2018 visit, no effective communication was fostered between Ms. Washington and University Hospitals staff and doctors.

128.    Because of Ms. Washington's continuing efforts to conceive and give birth to a child, Ms. Washington expects to continually visit University Hospitals in the near future.

### 4. Sandra Hatibovic

129.    Ms. Hatibovic is Deaf and ASL is her primary form of communication.

130.    On or about September 2017, Ms. Hatibovic sought medical care on behalf of her minor daughter ("M.P."), also Deaf, at University Hospital Parma Medical Center.

131.    M.P. was to be seen for a previously scheduled primary care visit with Dr. Ryan J. Vogelgesang, MD.

132.    Despite being aware of Ms. Hatibovic's preference for an on-site ASL interpreter, one was not provided.

133.    Instead, VRI was provided.

134.    Immediately after attempting to utilize VRI, it quickly became distorted, lagged, and was unable to be used to foster effective communication.

135.    On or about April 11, 2018, Ms. Hatibovic sought medical care on behalf of M.P. at University Hospital Parma Medical Center.

136.    Ms. Hatibovic brought M.P. to University Hospitals Parma Medical Center because she was experiencing a persistent and severe rash.

137.   Ms. Hatibovic requested an on-site ASL interpreter to help foster effective communication for both herself and her Deaf husband, Plaintiff Johnny Parsons.

138.   Instead of providing an on-site ASL interpreter, University Hospitals attempted to utilize VRI.

139.   Immediately after attempting to utilize VRI, the physician noted in M.P.'s treatment notes that "here with mom and dad, both parents and child are Deaf, attempted to use translator but system needed an update and did not work. We were able to understand one another without difficulty"

140.   Communication was continued through passed notes. Because of Ms. Hatibovic's limited English, she was unable to understand M.P.'s diagnosis, prognosis and treatment course.

141.   During the April 11, 2018 visit, no effective communication was fostered between Ms. Hatibovic and University Hospitals staff and doctors.

142.   As a result of not being provided an on-site interpreter or a functioning VRI, Ms. Hatibovic was unable to determine if M.P.'s rash was contagious.

143.   Ms. Hatibovic expects to continually seek care for herself and M.P. at University Hospitals, and University Hospitals is the primary health care provider for herself and M.P.

**5. Johnny Parsons**

144.   Mr. Parsons is Deaf and ASL is his primary form of communication.

145.   On or about April 11, 2018, Mr. Parsons sought medical care on behalf of his daughter, M.P., also Deaf, at University Hospital Parma Medical Center.

146.   Mr. Parsons brought M.P. to University Hospitals Parma Medical Center because she was experiencing a persistent and severe rash.

147.    Mr. Parsons requested an on-site interpreter to help foster effective communication for himself, his Deaf child, M.P. and his Deaf wife, Plaintiff Sandra Hatibovic

148.    Instead of providing an on-site ASL interpreter, University Hospitals attempted to utilize VRI.

149.    Immediately after attempting to utilize VRI, the physician noted in M.P.'s treatment notes that "here with mom and dad, both parents and child are Deaf, attempted to use translator but system needed an update and did not work. We were able to understand one another without difficulty"

150.    Communication was continued through passed notes. Because of Mr. Parsons' limited English, he was unable to understand M.P.'s diagnosis, prognosis and treatment course.

151.    During the April 11, 2018 visit, no effective communication was fostered between Mr. Parsons and University Hospitals staff and doctors.

152.    As a result of not being provided an on-site interpreter or a functioning VRI, Mr. Parsons was unable to determine if M.P.'s rash was contagious.

153.    Mr. Parsons expects to continually seek care for himself and M.P. at University Hospitals, and University Hospitals is the primary health care provider for himself and M.P.

**6. Antoinette Horan**

154.    Ms. Horan is Deaf and ASL is her primary form of communication.

155.    Ms. Horan understands how to read and write the Arabic language, but is unable to read and write the English language.

156.    On or about March 20, 2018, Ms. Horan sought medical care at University Hospitals Parma Medical Center.

157.   Ms. Horan visited University Hospitals Parma Medical Center to have a CT scan on her pelvis and abdomen.

158.   Prior to her appointment, Ms. Horan requested that an on-site ASL interpreter be provided so she could understand how the test would be performed.

159.   University Hospitals refused to provide an ASL interpreter or any auxiliary aid, and instead attempted to pass notes to Ms. Horan written in English.

160.   The notes passed to Ms. Horan did not foster any effective communication since Ms. Horan is illiterate in the English language.

161.   As a result of the ineffective communication, Ms. Horan did not understand what the solution was she had to ingest prior to the CT scan or why she had to ingest it.

162.   As a result of the ineffective communication, Ms. Horan did not understand how the CT scan would be administered.

163.   As a result of the ineffective communication, Ms. Horan was unable to communicate with any University Hospitals staff or doctors before, during, or after the CT scan.

164.   Ms. Horan has had numerous appointments with her primary care physician, Ali Saleh, MD, where no on-site ASL interpreter was provided at University Hospitals Parma Medical Center.

165.   Before each appointment, Ms. Horan would request that an on-site ASL interpreter be present.

166.   At each appointment with Dr. Saleh, no on-site ASL interpreter was provided.

167.   At each appointment with Dr. Saleh, no VRI was utilized.

168.   During each visit with Dr. Saleh, no effective communication was fostered between Ms. Horan and University Hospitals staff and doctors.

169.    Ms. Horan consistently visits her primary health care provider at University Hospitals and expects to continually visit University Hospitals in the near future for her health care.

### 7. Samantha Harry

170.    Ms. Harry is Deaf and ASL is her primary form of communication.

171.    On or about September 30, 2017, Ms. Harry sought medical care at UH Rainbow Babies and Children's Hospital in order to give birth to her child.

172.    Ms. Harry was hospitalized at University Hospitals for a total of three (3) days.

173.    After giving birth to her child on September 30, 2017, Ms. Harry was denied any on-site ASL interpreter or VRI on October 1, 2018 and October 2, 2018.

174.    Instead of providing Ms. Harry with an on-site ASL interpreter or VRI, Ms. Harry was forced to communicate by means of lip reading.

175.    Instead of providing Ms. Harry with an on-site ASL interpreter or VRI, University Hospitals deputized Ms. Harry's partner to interpret for Ms. Harry.

176.    University Hospitals deputized Ms. Harry's partner even though it had full knowledge he was not an ASL interpreter.

177.    Ms. Harry requested an on-site ASL interpreter or VRI numerous times during the two days she was hospitalized following the birth of her child.

178.    University Hospitals did not provide an on-site interpreter or VRI during the vital process of discharge with Ms. Harry's baby.

179.    Ms. Harry established primary care for her two children, (H.S.) and (E.S.), with Dr. Elizabeth Hagen, M.D. at University Hospital Kids in the Sun.

180.    Ms. Harry has requested the use of an on-site ASL interpreter for each visit.

181.   Ms. Harry has been unable to communicate with Dr. Hagen because of the VRI continually becomes distorted, lags, and is unable to be used to foster effective communication.

182.   Ms. Harry expects to continually seek care for herself and her children at University Hospitals, and University Hospitals is the primary health care provider for herself and her children.

**COUNT I**
**SECTION 504 OF THE REHABILITATION ACT OF 1973, 29 U.S.C. § 701 et seq.**
**(John Horan Against University Hospitals Health System, Inc.; University Hospitals Medical Group, Inc.; University Hospitals Cleveland Medical Center; and University Primary Care Practices, Inc.)**

183.   Plaintiff John Horan incorporates by reference the allegations from the preceding paragraphs, as if fully re-alleged herein.

184.   Mr. Horan is Deaf and his disability substantially limits one or more of his major life activities, including his ability to effectively communicate with others who are not fluent in ASL.

185.   Mr. Horan is therefore considered to be an individual with a disability under Section 504 of the Rehabilitation Act, as amended.

186.   University Hospitals is a recipient of federal financial assistance by virtue of receipt of Medicare and Medicaid payments, as well as other financial assistance.

187.   Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, requires that no qualified individual with a disability, on the basis of that disability, be excluded from participation in or be denied the benefit of the services, programs, activities, or to be otherwise discriminated against.

188.   The doctors, nurses, and all other employees and staff of University Hospitals who interacted with Mr. Horan had actual knowledge of his disability, yet, Mr. Horan was consistently denied any form of effective communication.

189.   Accordingly, University Hospitals discriminated against Mr. Horan in the equal use of its facilities, and as a result, Mr. Horan experienced mental anguish and humiliation in violation of her civil rights.

190.   University Hospitals failed to provide services to Mr. Horan as it would have provided a similarly situated hearing patient.

191.   University Hospitals' policies, practices, and procedures, particularly the actions and omissions described above, violated Mr. Horan's rights under Section 504 of the Rehabilitation Act by discriminating on the basis of a disability.

192.   University Hospitals has discriminated against Mr. Horan by failing to provide auxiliary aids and services necessary to ensure effective communication with individuals who are Deaf or hard of hearing in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

193.   At all times material, the employees, staff, and agents of University Hospitals would have been able to communicate effectively with Mr. Horan if University Hospitals had provided qualified interpreter services.

194.   University Hospitals staff knew that Mr. Horan would be harmed by their failure to provide an interpreter.

195.   As a result of University Hospitals' actions, Mr. Horan has been damaged and experienced emotional suffering, pain, and anguish.

196.   University Hospitals actions were intentional, with reckless disregard, and with deliberate indifference to the rights and needs of Mr. Horan.

## COUNT II
## TITLE III OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12181 et seq.
### (John Horan Against University Hospitals Health System, Inc.; University Hospitals Medical Group, Inc.; University Hospitals Cleveland Medical Center; and University Primary Care Practices, Inc.)

197.    Plaintiff John Horan incorporates by reference the allegations from the preceding paragraphs, as if fully re-alleged herein.

198.    Mr. Horan's hearing loss substantially limits his major life activities, including his ability to effectively communicate.

199.    Mr. Horan is an individual with a disability under Title III of the Americans with Disabilities Act.

200.    Mr. Horan meets the essential eligibility requirements for Defendants' services at all times material hereto.

201.    Mr. Horan will likely return to University Hospitals premises in the near future and will be harmed by University Hospitals' discriminatory policies and procedures.

202.    University Hospitals violated Title III of the Americans with Disabilities Act in numerous ways, including discriminatory actions which occurred when University Hospitals:

    a.    Failed to maintain policies and procedures to ensure compliance with Title III of the Americans with Disabilities Act, specifically policies that provide equal access and effective communication to individuals with disabilities, 28 C.F.R. § 36.303(a) (2010);

    b.    Failed to ensure that communications with Mr. Horan was as effective as communications with non-disabled patients, 28 C.F.R. § 36.303(a) (2010);

    c.   Failed to provide auxiliary aids and services, including a qualified interpreter, and to modify policies and procedures to prevent discrimination against Plaintiff, 28 C.F.R. § 36.303(a) (2010), 28 C.F.R. § 36.302(a) (2010);

    d.   Excluded Mr. Horan from services of the public entity and denied Mr. Horan the benefit of these services due to her disabilities, 28 C.F.R. § 36.202(a) (2010).

203.   University Hospitals had knowledge of its obligations under the Americans with Disabilities Act and was deliberately indifferent to the rights of Mr. Horan.

204.   University Hospitals knew that Mr. Horan would be harmed by their failure to provide an interpreter.

**COUNT III**
**SECTION 1557 OF THE PATIENT PROTECTION AND AFFORDABLE CARE ACT, 42 U.S.C. § 18116**
**(John Horan Against University Hospitals Health System, Inc.; University Hospitals Medical Group, Inc.; University Hospitals Cleveland Medical Center; and University Primary Care Practices, Inc.)**

205.   Plaintiff John Horan incorporates by reference the allegations from the preceding paragraphs, as if fully re-alleged herein.

206.   At all times relevant to this action, Section 1557 of the Patient Protection and Affordable Care Act ("Section 1557"), was in full force and effect and applied to the Defendants' conduct.

207.   At all times relevant to this action, Section 1557, 42 U.S.C. § 18116, incorporated the definition of disability in the Rehabilitation Act, 29 U.S.C. § 705(9).

208.   At all times relevant to this action, Mr. Horan had substantial limitations to the major life activity of hearing and speaking, and was an individual with a disability within the meaning of the Rehabilitation Act, 29 U.S.C. § 705(9) and Section 1557, 42 U.S.C. § 18116.

209.    At all times relevant to this action, Mr. Horan's primary language for communication was ASL and not English; and Mr. Horan had limited ability to read, write, speak, or understand English, and was an individual with limited English proficiency within the meaning of Section 1557, 45 C.F.R. § 92.4.

210.    At all times relevant to this action, Defendants received federal financial assistance, including Medicaid reimbursements, and was principally engaged in the business of providing health care. Therefore, Defendants are health programs or activities receiving federal financial assistance pursuant to 42 U.S.C. § 18116(a).

211.    Pursuant to Section 1557, "an individual shall not, on the grounds prohibited...under section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance . . ." 42 USC § 18116.

212.    Defendants have discriminated and continue to discriminate against Mr. Horan solely on the basis of Mr. Horan's disabilities and his limited English proficiency denying him meaningful access to the services, programs, and benefits Defendants offer to other individuals by refusing to provide auxiliary aids and services necessary to ensure effective communication in violation of Section 1157, 42 U.S.C. § 18116.

213.    Defendants discriminated against Mr. Horan by failing to ensure effective communication through the providing of qualified sign language interpreters.

214.    As set out above, absent injunctive relief there is a clear risk that Defendants' actions will recur again with Mr. Horan and other Deaf patients and family members.

215.   Mr. Horan is therefore entitled to seek and recover compensatory damages for the injuries and loss he sustained as a result of Defendants' intentionally discriminatory conduct as alleged, pursuant to 42 U.S.C. § 18116(a).

216.   Mr. Horan is further entitled to an award of attorney's fees, costs, and disbursements pursuant to 42 U.S.C. § 18116(a) and/or common law.

**COUNT IV**
**SECTION 504 OF THE REHABILITATION ACT OF 1973, 29 U.S.C. § 701 et seq.**
**(Heather Wagley Against University Hospitals Health System, Inc.; University Hospitals Medical Group, Inc.; and University Primary Care Practices, Inc.)**

217.   Plaintiff Heather Wagley incorporates by reference the allegations from the preceding paragraphs, as if fully re-alleged herein.

218.   Ms. Wagley is Deaf and her disability substantially limits one or more of her major life activities, including her ability to effectively communicate with others who are not fluent in ASL.

219.   Ms. Wagley is therefore considered to be an individual with a disability under Section 504 of the Rehabilitation Act, as amended.

220.   University Hospitals is a recipient of federal financial assistance by virtue of receipt of Medicare and Medicaid payments, as well as other financial assistance.

221.   Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, requires that no qualified individual with a disability, on the basis of that disability, be excluded from participation in or be denied the benefit of the services, programs, activities, or to be otherwise discriminated against.

222.   The doctors, nurses, and all other employees and staff of University Hospitals who interacted with Ms. Wagley had actual knowledge of her disability, yet, Ms. Wagley was consistently denied any form of effective communication.

223.    Accordingly, University Hospitals discriminated against Ms. Wagley in the equal use of its facilities, and as a result, Ms. Wagley experienced mental anguish and humiliation in violation of her civil rights.

224.    University Hospitals failed to provide services to Ms. Wagley as it would have provided a similarly situated hearing patient.

225.    University Hospitals' policies, practices, and procedures, particularly the actions and omissions described above, violated Ms. Wagley's rights under Section 504 of the Rehabilitation Act by discriminating on the basis of a disability.

226.    University Hospitals has discriminated against Ms. Wagley by failing to provide auxiliary aids and services necessary to ensure effective communication with individuals who are Deaf or hard of hearing in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

227.    At all times material, the employees, staff, and agents of University Hospitals would have been able to communicate effectively with Ms. Wagley if University Hospitals had provided qualified interpreter services.

228.    University Hospitals staff knew that Ms. Wagley would be harmed by their failure to provide an interpreter.

229.    As a result of University Hospitals' actions, Ms. Wagley has been damaged and experienced emotional suffering, pain, and anguish.

230.    University Hospitals actions were intentional, with reckless disregard, and with deliberate indifference to the rights and needs of Ms. Wagley.

## COUNT V
## TITLE III OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12181 et seq.
### (Heather Wagley Against University Hospitals Health System, Inc.; University Hospitals Medical Group, Inc.; and University Primary Care Practices, Inc.)

231.   Plaintiff Heather Wagley incorporates by reference the allegations from the preceding paragraphs, as if fully re-alleged herein.

232.   Ms. Wagley's hearing loss substantially limits her major life activities, including her ability to effectively communicate.

233.   Ms. Wagley is an individual with a disability under Title III of the Americans with Disabilities Act.

234.   Ms. Wagley meets the essential eligibility requirements for Defendants' services at all times material hereto.

235.   Ms. Wagley will likely return to University Hospitals premises in the near future and will be harmed by University Hospitals' discriminatory policies and procedures.

236.   University Hospitals violated Title III of the Americans with Disabilities Act in numerous ways, including discriminatory actions which occurred when University Hospitals:

   a.   Failed to maintain policies and procedures to ensure compliance with Title III of the Americans with Disabilities Act, specifically policies that provide equal access and effective communication to individuals with disabilities, 28 C.F.R. § 36.303(a) (2010);

   b.   Failed to ensure that communications with Ms. Wagley was as effective as communications with non-disabled patients, 28 C.F.R. § 36.303(a) (2010);

   c.   Failed to provide auxiliary aids and services, including a qualified interpreter, and to modify policies and procedures to prevent discrimination against Plaintiff, 28 C.F.R. § 36.303(a) (2010), 28 C.F.R. § 36.302(a) (2010);

d.   Excluded Ms. Wagley from services of the public entity and denied Ms. Wagley the

benefit of these services due to her disabilities, 28 C.F.R. § 36.202(a) (2010).

237.   University Hospitals had knowledge of its obligations under the Americans with

Disabilities Act and was deliberately indifferent to the rights of Ms. Wagley.

University Hospitals knew that Ms. Wagley would be harmed by their failure to provide an

interpreter.

### COUNT VI
### SECTION 1557 OF THE PATIENT PROTECTION AND AFFORDABLE CARE ACT, 42 U.S.C. § 18116
**(Heather Wagley Against University Hospitals Health System, Inc.; University Hospitals Medical Group, Inc.; and University Primary Care Practices, Inc.)**

238.   Plaintiff Heather Wagley incorporates by reference the allegations from the preceding

paragraphs, as if fully re-alleged herein.

239.   At all times relevant to this action, Section 1557 of the Patient Protection and Affordable

Care Act ("Section 1557"), was in full force and effect and applied to the Defendants'

conduct.

240.   At all times relevant to this action, Section 1557, 42 U.S.C. § 18116, incorporated the

definition of disability in the Rehabilitation Act, 29 U.S.C. § 705(9).

241.   At all times relevant to this action, Ms. Wagley had substantial limitations to the major

life activity of hearing and speaking, and was an individual with a disability within the

meaning of the Rehabilitation Act, 29 U.S.C. § 705(9) and Section 1557, 42 U.S.C. § 18116.

242.   At all times relevant to this action, Ms. Wagley's primary language for communication

was ASL and not English; and Ms. Wagley had limited ability to read, write, speak, or

understand English, and was an individual with limited English proficiency within the

meaning of Section 1557, 45 C.F.R. § 92.4.

243. At all times relevant to this action, Defendants received federal financial assistance, including Medicaid reimbursements, and was principally engaged in the business of providing health care. Therefore, Defendants are health programs or activities receiving federal financial assistance pursuant to 42 U.S.C. § 18116(a).

244. Pursuant to Section 1557, "an individual shall not, on the grounds prohibited...under section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance . . ." 42 USC § 18116.

245. Defendants have discriminated and continue to discriminate against Ms. Wagley solely on the basis of Ms. Wagley's disabilities and her limited English proficiency denying her meaningful access to the services, programs, and benefits Defendants offer to other individuals by refusing to provide auxiliary aids and services necessary to ensure effective communication in violation of Section 1157, 42 U.S.C. § 18116.

246. Defendants discriminated against Ms. Wagley by failing to ensure effective communication through the providing of qualified sign language interpreters.

247. As set out above, absent injunctive relief there is a clear risk that Defendants' actions will recur again with Ms. Wagley and other Deaf patients and family members.

248. Ms. Wagley is therefore entitled to seek and recover compensatory damages for the injuries and loss she sustained as a result of Defendants' intentionally discriminatory conduct as alleged, pursuant to 42 U.S.C. § 18116(a).

249. Ms. Wagley is further entitled to an award of attorney's fees, costs, and disbursements pursuant to 42 U.S.C. § 18116(a) and/or common law.

## COUNT VII
## SECTION 504 OF THE REHABILITATION ACT OF 1973, 29 U.S.C. § 701 et seq.
**(Sonya Washington Against University Hospitals Health System, Inc.; University Hospitals Ahuja Medical Center, Inc.; University Hospitals Medical Group, Inc.; and University Primary Care Practices, Inc.)**

250. Plaintiff Sonya Washington incorporates by reference the allegations from the preceding paragraphs, as if fully re-alleged herein.

251. Ms. Washington is Deaf and her disability substantially limits one or more of her major life activities, including her ability to effectively communicate with others who are not fluent in ASL.

252. Ms. Washington is therefore considered to be an individual with a disability under Section 504 of the Rehabilitation Act, as amended.

253. University Hospitals is a recipient of federal financial assistance by virtue of receipt of Medicare and Medicaid payments, as well as other financial assistance.

254. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, requires that no qualified individual with a disability, on the basis of that disability, be excluded from participation in or be denied the benefit of the services, programs, activities, or to be otherwise discriminated against.

255. The doctors, nurses, and all other employees and staff of University Hospitals who interacted with Ms. Washington had actual knowledge of her disability, yet, Ms. Washington was consistently denied any form of effective communication.

256. Accordingly, University Hospitals discriminated against Ms. Washington in the equal use of its facilities, and as a result, Ms. Washington experienced mental anguish and humiliation in violation of her civil rights.

257.    University Hospitals failed to provide services to Ms. Washington as it would have provided a similarly situated hearing patient.

258.    University Hospitals' policies, practices, and procedures, particularly the actions and omissions described above, violated Ms. Washington's rights under Section 504 of the Rehabilitation Act by discriminating on the basis of a disability.

259.    University Hospitals has discriminated against Ms. Washington by failing to provide auxiliary aids and services necessary to ensure effective communication with individuals who are Deaf or hard of hearing in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

260.    At all times material, the employees, staff, and agents of University Hospitals would have been able to communicate effectively with Ms. Washington if University Hospitals had provided qualified interpreter services.

261.    University Hospitals staff knew that Ms. Washington would be harmed by their failure to provide an interpreter.

262.    As a result of University Hospitals' actions, Ms. Washington has been damaged and experienced emotional suffering, pain, and anguish.

263.    University Hospitals actions were intentional, with reckless disregard, and with deliberate indifference to the rights and needs of Ms. Washington.

## COUNT VIII
## TITLE III OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12181 et seq.
**(Sonya Washington Against University Hospitals Health System, Inc.; University Hospitals Ahuja Medical Center, Inc.; University Hospitals Medical Group, Inc.; and University Primary Care Practices, Inc.)**

264.    Plaintiff Sonya Washington incorporates by reference the allegations from the preceding paragraphs, as if fully re-alleged herein.

265.    Ms. Washington's hearing loss substantially limits her major life activities, including her ability to effectively communicate.

266.    Ms. Washington is an individual with a disability under Title III of the Americans with Disabilities Act.

267.    Ms. Washington meets the essential eligibility requirements for Defendants' services at all times material hereto.

268.    Ms. Washington will likely return to University Hospitals premises in the near future and will be harmed by University Hospitals' discriminatory policies and procedures.

269.    University Hospitals violated Title III of the Americans with Disabilities Act in numerous ways, including discriminatory actions which occurred when University Hospitals:

    a. Failed to maintain policies and procedures to ensure compliance with Title III of the Americans with Disabilities Act, specifically policies that provide equal access and effective communication to individuals with disabilities, 28 C.F.R. § 36.303(a) (2010);

    b. Failed to ensure that communications with Ms. Washington was as effective as communications with non-disabled patients, 28 C.F.R. § 36.303(a) (2010);

    c. Failed to provide auxiliary aids and services, including a qualified interpreter, and to modify policies and procedures to prevent discrimination against Plaintiff, 28 C.F.R. § 36.303(a) (2010), 28 C.F.R. § 36.302(a) (2010);

    d. Excluded Ms. Washington from services of the public entity and denied Ms. Washington the benefit of these services due to her disabilities, 28 C.F.R. § 36.202(a) (2010).

270.    University Hospitals had knowledge of its obligations under the Americans with Disabilities Act and was deliberately indifferent to the rights of Ms. Washington.

271.    University Hospitals knew that Ms. Washington would be harmed by their failure to provide an interpreter.

## COUNT IX
## SECTION 1557 OF THE PATIENT PROTECTION AND AFFORDABLE CARE ACT, 42 U.S.C. § 18116
**(Sonya Washington Against University Hospitals Health System, Inc.; University Hospitals Ahuja Medical Center, Inc.; University Hospitals Medical Group, Inc.; and University Primary Care Practices, Inc.)**

272.    Plaintiff Sonya Washington incorporates by reference the allegations from the preceding paragraphs, as if fully re-alleged herein.

273.    At all times relevant to this action, Section 1557 of the Patient Protection and Affordable Care Act ("Section 1557"), was in full force and effect and applied to the Defendants' conduct.

274.    At all times relevant to this action, Section 1557, 42 U.S.C. § 18116, incorporated the definition of disability in the Rehabilitation Act, 29 U.S.C. § 705(9).

275.    At all times relevant to this action, Ms. Washington had substantial limitations to the major life activity of hearing and speaking, and was an individual with a disability within the meaning of the Rehabilitation Act, 29 U.S.C. § 705(9) and Section 1557, 42 U.S.C. § 18116.

276.    At all times relevant to this action, Ms. Washington's primary language for communication was ASL and not English; and Ms. Washington had limited ability to read, write, speak, or understand English, and was an individual with limited English proficiency within the meaning of Section 1557, 45 C.F.R. § 92.4.

277.    At all times relevant to this action, Defendants received federal financial assistance, including Medicaid reimbursements, and was principally engaged in the business of

providing health care. Therefore, Defendants are health programs or activities receiving federal financial assistance pursuant to 42 U.S.C. § 18116(a).

278.    Pursuant to Section 1557, "an individual shall not, on the grounds prohibited...under section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance . . ." 42 USC § 18116.

279.    Defendants have discriminated and continue to discriminate against Ms. Washington solely on the basis of Ms. Washington's disabilities and her limited English proficiency denying her meaningful access to the services, programs, and benefits Defendants offer to other individuals by refusing to provide auxiliary aids and services necessary to ensure effective communication in violation of Section 1157, 42 U.S.C. § 18116.

280.    Defendants discriminated against Ms. Washington by failing to ensure effective communication through the providing of qualified sign language interpreters.

281.    As set out above, absent injunctive relief there is a clear risk that Defendants' actions will recur again with Ms. Washington and other Deaf patients and family members.

282.    Ms. Washington is therefore entitled to seek and recover compensatory damages for the injuries and loss she sustained as a result of Defendants' intentionally discriminatory conduct as alleged, pursuant to 42 U.S.C. § 18116(a).

283.    Ms. Washington is further entitled to an award of attorney's fees, costs, and disbursements pursuant to 42 U.S.C. § 18116(a) and/or common law.

## COUNT X
### SECTION 504 OF THE REHABILITATION ACT OF 1973, 29 U.S.C. § 701 et seq.
**(Sandra Hatibovic Against University Hospitals Health System, Inc.; University Hospitals Medical Group, Inc.; and University Primary Care Practices, Inc.)**

284.   Plaintiff Sandra Hatibovic incorporates by reference the allegations from the preceding paragraphs, as if fully re-alleged herein.

285.   Ms. Hatibovic is Deaf and her disability substantially limits one or more of her major life activities, including her ability to effectively communicate with others who are not fluent in ASL.

286.   Ms. Hatibovic is therefore considered to be an individual with a disability under Section 504 of the Rehabilitation Act, as amended.

287.   University Hospitals is a recipient of federal financial assistance by virtue of receipt of Medicare and Medicaid payments, as well as other financial assistance.

288.   Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, requires that no qualified individual with a disability, on the basis of that disability, be excluded from participation in or be denied the benefit of the services, programs, activities, or to be otherwise discriminated against.

289.   The doctors, nurses, and all other employees and staff of University Hospitals who interacted with Ms. Hatibovic had actual knowledge of her disability, yet, Ms. Hatibovic was consistently denied any form of effective communication.

290.   Accordingly, University Hospitals discriminated against Ms. Hatibovic in the equal use of its facilities, and as a result, Ms. Hatibovic experienced mental anguish and humiliation in violation of her civil rights.

291.   University Hospitals failed to provide services to Ms. Hatibovic as it would have provided a similarly situated hearing patient.

292.    University Hospitals' policies, practices, and procedures, particularly the actions and omissions described above, violated Ms. Hatibovic's rights under Section 504 of the Rehabilitation Act by discriminating on the basis of a disability.

293.    University Hospitals has discriminated against Ms. Hatibovic by failing to provide auxiliary aids and services necessary to ensure effective communication with individuals who are Deaf or hard of hearing in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

294.    At all times material, the employees, staff, and agents of University Hospitals would have been able to communicate effectively with Ms. Hatibovic if University Hospitals had provided qualified interpreter services.

295.    University Hospitals staff knew that Ms. Hatibovic would be harmed by their failure to provide an interpreter.

296.    As a result of University Hospitals' actions, Ms. Hatibovic has been damaged and experienced emotional suffering, pain, and anguish.

297.    University Hospitals actions were intentional, with reckless disregard, and with deliberate indifference to the rights and needs of Ms. Hatibovic.

## COUNT XI
## TITLE III OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12181 et seq.
**(Sandra Hatibovic Against University Hospitals Health System, Inc.; University Hospitals Medical Group, Inc.; and University Primary Care Practices, Inc.)**

298.    Plaintiff Sandra Hatibovic incorporates by reference the allegations from the preceding paragraphs, as if fully re-alleged herein.

299.    Ms. Hatibovic's hearing loss substantially limits her major life activities, including her ability to effectively communicate.

300.   Ms. Hatibovic is an individual with a disability under Title III of the Americans with Disabilities Act.

301.   Ms. Hatibovic meets the essential eligibility requirements for Defendants' services at all times material hereto.

302.   Ms. Hatibovic will likely return to University Hospitals premises in the near future and will be harmed by University Hospitals' discriminatory policies and procedures.

303.   University Hospitals violated Title III of the Americans with Disabilities Act in numerous ways, including discriminatory actions which occurred when University Hospitals:

    a.   Failed to maintain policies and procedures to ensure compliance with Title III of the Americans with Disabilities Act, specifically policies that provide equal access and effective communication to individuals with disabilities, 28 C.F.R. § 36.303(a) (2010);

    b.   Failed to ensure that communications with Ms. Hatibovic was as effective as communications with non-disabled patients, 28 C.F.R. § 36.303(a) (2010);

    c.   Failed to provide auxiliary aids and services, including a qualified interpreter, and to modify policies and procedures to prevent discrimination against Plaintiff, 28 C.F.R. § 36.303(a) (2010), 28 C.F.R. § 36.302(a) (2010);

    d.   Excluded Ms. Hatibovic from services of the public entity and denied Ms. Hatibovic the benefit of these services due to her disabilities, 28 C.F.R. § 36.202(a) (2010).

304.   University Hospitals had knowledge of its obligations under the Americans with Disabilities Act and was deliberately indifferent to the rights of Ms. Hatibovic.

305.   University Hospitals knew that Ms. Hatibovic would be harmed by their failure to provide an interpreter.

**COUNT XII**
**SECTION 1557 OF THE PATIENT PROTECTION AND AFFORDABLE CARE ACT, 42**
**U.S.C. § 18116**
**(Sandra Hatibovic Against University Hospitals Health System, Inc.; University Hospitals**
**Medical Group, Inc.; and University Primary Care Practices, Inc.)**

306. Plaintiff Sandra Hatibovic incorporates by reference the allegations from the preceding paragraphs, as if fully re-alleged herein.

307. At all times relevant to this action, Section 1557 of the Patient Protection and Affordable Care Act ("Section 1557"), was in full force and effect and applied to the Defendants' conduct.

308. At all times relevant to this action, Section 1557, 42 U.S.C. § 18116, incorporated the definition of disability in the Rehabilitation Act, 29 U.S.C. § 705(9).

309. At all times relevant to this action, Ms. Hatibovic had substantial limitations to the major life activity of hearing and speaking, and was an individual with a disability within the meaning of the Rehabilitation Act, 29 U.S.C. § 705(9) and Section 1557, 42 U.S.C. § 18116.

310. At all times relevant to this action, Ms. Hatibovic's primary language for communication was ASL and not English; and Ms. Hatibovic had limited ability to read, write, speak, or understand English, and was an individual with limited English proficiency within the meaning of Section 1557, 45 C.F.R. § 92.4.

311. At all times relevant to this action, Defendants received federal financial assistance, including Medicaid reimbursements, and was principally engaged in the business of providing health care. Therefore, Defendants are health programs or activities receiving federal financial assistance pursuant to 42 U.S.C. § 18116(a).

312. Pursuant to Section 1557, "an individual shall not, on the grounds prohibited...under section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance . . ." 42 USC § 18116.

313.    Defendants have discriminated and continue to discriminate against Ms. Hatibovic solely on the basis of Ms. Hatibovic's disabilities and her limited English proficiency denying her meaningful access to the services, programs, and benefits Defendants offer to other individuals by refusing to provide auxiliary aids and services necessary to ensure effective communication in violation of Section 1157, 42 U.S.C. § 18116.

314.    Defendants discriminated against Ms. Hatibovic by failing to ensure effective communication through the providing of qualified sign language interpreters.

315.    As set out above, absent injunctive relief there is a clear risk that Defendants' actions will recur again with Ms. Hatibovic and other Deaf patients and family members.

316.    Ms. Hatibovic is therefore entitled to seek and recover compensatory damages for the injuries and loss she sustained as a result of Defendants' intentionally discriminatory conduct as alleged, pursuant to 42 U.S.C. § 18116(a).

317.    Ms. Hatibovic is further entitled to an award of attorney's fees, costs, and disbursements pursuant to 42 U.S.C. § 18116(a) and/or common law.

## COUNT XIII
### SECTION 504 OF THE REHABILITATION ACT OF 1973, 29 U.S.C. § 701 et seq.
**(Johnny Parsons Against University Hospitals Health System, Inc.; University Hospitals Medical Group, Inc.; and University Primary Care Practices, Inc.)**

318.    Plaintiff Johnny Parsons incorporates by reference the allegations from the preceding paragraphs, as if fully re-alleged herein.

319.    Mr. Parsons is Deaf and his disability substantially limits one or more of his major life activities, including his ability to effectively communicate with others who are not fluent in ASL.

320.    Mr. Parsons is therefore considered to be an individual with a disability under Section 504 of the Rehabilitation Act, as amended.

321.    University Hospitals is a recipient of federal financial assistance by virtue of receipt of Medicare and Medicaid payments, as well as other financial assistance.

322.    Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, requires that no qualified individual with a disability, on the basis of that disability, be excluded from participation in or be denied the benefit of the services, programs, activities, or to be otherwise discriminated against.

323.    The doctors, nurses, and all other employees and staff of University Hospitals who interacted with Mr. Parsons had actual knowledge of his disability, yet, Mr. Parsons was consistently denied any form of effective communication.

324.    Accordingly, University Hospitals discriminated against Mr. Parsons in the equal use of its facilities, and as a result, Mr. Parsons experienced mental anguish and humiliation in violation of her civil rights.

325.    University Hospitals failed to provide services to Mr. Parsons as it would have provided a similarly situated hearing patient.

326.    University Hospitals' policies, practices, and procedures, particularly the actions and omissions described above, violated Mr. Parsons's rights under Section 504 of the Rehabilitation Act by discriminating on the basis of a disability.

327.    University Hospitals has discriminated against Mr. Parsons by failing to provide auxiliary aids and services necessary to ensure effective communication with individuals who are Deaf or hard of hearing in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

328.    At all times material, the employees, staff, and agents of University Hospitals would have been able to communicate effectively with Mr. Parsons if University Hospitals had provided qualified interpreter services.

329.    University Hospitals staff knew that Mr. Parsons would be harmed by their failure to provide an interpreter.

330.    As a result of University Hospitals' actions, Mr. Parsons has been damaged and experienced emotional suffering, pain, and anguish.

331.    University Hospitals actions were intentional, with reckless disregard, and with deliberate indifference to the rights and needs of Mr. Parsons.

## COUNT XIV
### TITLE III OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12181 et seq.
**(Johnny Parsons Against University Hospitals Health System, Inc.; University Hospitals Medical Group, Inc.; and University Primary Care Practices, Inc.)**

332.    Plaintiff Johnny Parsons incorporates by reference the allegations from the preceding paragraphs, as if fully re-alleged herein.

333.    Mr. Parsons's hearing loss substantially limits his major life activities, including his ability to effectively communicate.

334.    Mr. Parsons is an individual with a disability under Title III of the Americans with Disabilities Act.

335.    Mr. Parsons meets the essential eligibility requirements for Defendants' services at all times material hereto.

336.    Mr. Parsons will likely return to University Hospitals premises in the near future and will be harmed by University Hospitals' discriminatory policies and procedures.

337.    University Hospitals violated Title III of the Americans with Disabilities Act in numerous ways, including discriminatory actions which occurred when University Hospitals:

    a.  Failed to maintain policies and procedures to ensure compliance with Title III of the Americans with Disabilities Act, specifically policies that provide equal access and effective communication to individuals with disabilities, 28 C.F.R. § 36.303(a) (2010);

    b.  Failed to ensure that communications with Mr. Parsons was as effective as communications with non-disabled patients, 28 C.F.R. § 36.303(a) (2010);

    c.  Failed to provide auxiliary aids and services, including a qualified interpreter, and to modify policies and procedures to prevent discrimination against Plaintiff, 28 C.F.R. § 36.303(a) (2010), 28 C.F.R. § 36.302(a) (2010);

    d.  Excluded Mr. Parsons from services of the public entity and denied Mr. Parsons the benefit of these services due to her disabilities, 28 C.F.R. § 36.202(a) (2010).

338.    University Hospitals had knowledge of its obligations under the Americans with Disabilities Act and was deliberately indifferent to the rights of Mr. Parsons.

339.    University Hospitals knew that Mr. Parsons would be harmed by their failure to provide an interpreter.

**COUNT XV**
**SECTION 1557 OF THE PATIENT PROTECTION AND AFFORDABLE CARE ACT, 42**
**U.S.C. § 18116**
**(Johnny Parsons Against University Hospitals Health System, Inc.; University Hospitals**
**Medical Group, Inc.; and University Primary Care Practices, Inc.)**

340.    Plaintiff Johnny Parsons incorporates by reference the allegations from the preceding

paragraphs, as if fully re-alleged herein.

341.    At all times relevant to this action, Section 1557 of the Patient Protection and Affordable

Care Act ("Section 1557"), was in full force and effect and applied to the Defendants'

conduct.

342.    At all times relevant to this action, Section 1557, 42 U.S.C. § 18116, incorporated the

definition of disability in the Rehabilitation Act, 29 U.S.C. § 705(9).

343.    At all times relevant to this action, Mr. Parsons had substantial limitations to the major

life activity of hearing and speaking, and was an individual with a disability within the

meaning of the Rehabilitation Act, 29 U.S.C. § 705(9) and Section 1557, 42 U.S.C. § 18116.

344.    At all times relevant to this action, Mr. Parsons' primary language for communication

was ASL and not English; and Mr. Parsons' had limited ability to read, write, speak, or

understand English, and was an individual with limited English proficiency within the

meaning of Section 1557, 45 C.F.R. § 92.4.

345.    At all times relevant to this action, Defendants received federal financial assistance,

including Medicaid reimbursements, and was principally engaged in the business of

providing health care. Therefore, Defendants are health programs or activities receiving

federal financial assistance pursuant to 42 U.S.C. § 18116(a).

346.    Pursuant to Section 1557, "an individual shall not, on the grounds prohibited...under

section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance . . ." 42 USC § 18116.

347. Defendants have discriminated and continue to discriminate against Mr. Parsons solely on the basis of Mr. Parsons' disabilities and his limited English proficiency denying him meaningful access to the services, programs, and benefits Defendants offer to other individuals by refusing to provide auxiliary aids and services necessary to ensure effective communication in violation of Section 1157, 42 U.S.C. § 18116.

348. Defendants discriminated against Mr. Parsons by failing to ensure effective communication through the providing of qualified sign language interpreters.

349. As set out above, absent injunctive relief there is a clear risk that Defendants' actions will recur again with Mr. Parsons and other Deaf patients and family members.

350. Mr. Parsons is therefore entitled to seek and recover compensatory damages for the injuries and loss he sustained as a result of Defendants' intentionally discriminatory conduct as alleged, pursuant to 42 U.S.C. § 18116(a).

351. Mr. Parsons is further entitled to an award of attorney's fees, costs, and disbursements pursuant to 42 U.S.C. § 18116(a) and/or common law.

## COUNT XVI
## SECTION 504 OF THE REHABILITATION ACT OF 1973, 29 U.S.C. § 701 et seq.
### (Antoinette Horan Against University Hospitals Health System, Inc.; University Hospitals Medical Group, Inc.; and University Primary Care Practices, Inc.)

352. Plaintiff Antoinette Horan incorporates by reference the allegations from the preceding paragraphs, as if fully re-alleged herein.

353. Ms. Horan is Deaf and her disability substantially limits one or more of her major life activities, including her ability to effectively communicate with others who are not fluent in ASL.

354. Ms. Horan is therefore considered to be an individual with a disability under Section 504 of the Rehabilitation Act, as amended.

355. University Hospitals is a recipient of federal financial assistance by virtue of receipt of Medicare and Medicaid payments, as well as other financial assistance.

356. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, requires that no qualified individual with a disability, on the basis of that disability, be excluded from participation in or be denied the benefit of the services, programs, activities, or to be otherwise discriminated against.

357. The doctors, nurses, and all other employees and staff of University Hospitals who interacted with Ms. Horan had actual knowledge of her disability, yet, Ms. Horan was consistently denied any form of effective communication.

358. Accordingly, University Hospitals discriminated against Ms. Horan in the equal use of its facilities, and as a result, Ms. Horan experienced mental anguish and humiliation in violation of her civil rights.

359. University Hospitals failed to provide services to Ms. Horan as it would have provided a similarly situated hearing patient.

360. University Hospitals' policies, practices, and procedures, particularly the actions and omissions described above, violated Ms. Horan's rights under Section 504 of the Rehabilitation Act by discriminating on the basis of a disability.

361.    University Hospitals has discriminated against Ms. Horan by failing to provide auxiliary aids and services necessary to ensure effective communication with individuals who are Deaf or hard of hearing in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

362.    At all times material, the employees, staff, and agents of University Hospitals would have been able to communicate effectively with Ms. Horan if University Hospitals had provided qualified interpreter services.

363.    University Hospitals staff knew that Ms. Horan would be harmed by their failure to provide an interpreter.

364.    As a result of University Hospitals' actions, Ms. Horan has been damaged and experienced emotional suffering, pain, and anguish.

365.    University Hospitals actions were intentional, with reckless disregard, and with deliberate indifference to the rights and needs of Ms. Horan.

## COUNT XVII
## TITLE III OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12181 et seq.
### (Antoinette Horan Against University Hospitals Health System, Inc.; University Hospitals Medical Group, Inc.; and University Primary Care Practices, Inc.)

366.    Plaintiff Antoinette Horan incorporates by reference the allegations from the preceding paragraphs, as if fully re-alleged herein.

367.    Ms. Horan's hearing loss substantially limits her major life activities, including her ability to effectively communicate.

368.    Ms. Horan is an individual with a disability under Title III of the Americans with Disabilities Act.

369.    Ms. Horan meets the essential eligibility requirements for Defendants' services at all times material hereto.

370. Ms. Horan will likely return to University Hospitals premises in the near future and will be harmed by University Hospitals' discriminatory policies and procedures.

371. University Hospitals violated Title III of the Americans with Disabilities Act in numerous ways, including discriminatory actions which occurred when University Hospitals:

    a. Failed to maintain policies and procedures to ensure compliance with Title III of the Americans with Disabilities Act, specifically policies that provide equal access and effective communication to individuals with disabilities, 28 C.F.R. § 36.303(a) (2010);

    b. Failed to ensure that communications with Ms. Horan was as effective as communications with non-disabled patients, 28 C.F.R. § 36.303(a) (2010);

    c. Failed to provide auxiliary aids and services, including a qualified interpreter, and to modify policies and procedures to prevent discrimination against Plaintiff, 28 C.F.R. § 36.303(a) (2010), 28 C.F.R. § 36.302(a) (2010);

    d. Excluded Ms. Horan from services of the public entity and denied Ms. Horan the benefit of these services due to her disabilities, 28 C.F.R. § 36.202(a) (2010).

372. University Hospitals had knowledge of its obligations under the Americans with Disabilities Act and was deliberately indifferent to the rights of Ms. Horan.

373. University Hospitals knew that Ms. Horan would be harmed by their failure to provide an interpreter.

## COUNT XVIII
## SECTION 1557 OF THE PATIENT PROTECTION AND AFFORDABLE CARE ACT, 42 U.S.C. § 18116
### (Antoinette Horan Against University Hospitals Health System, Inc.; University Hospitals Medical Group, Inc.; and University Primary Care Practices, Inc.)

374.     Plaintiff Antoinette Horan incorporates by reference the allegations from the preceding paragraphs, as if fully re-alleged herein.

375.     At all times relevant to this action, Section 1557 of the Patient Protection and Affordable Care Act ("Section 1557"), was in full force and effect and applied to the Defendants' conduct.

376.     At all times relevant to this action, Section 1557, 42 U.S.C. § 18116, incorporated the definition of disability in the Rehabilitation Act, 29 U.S.C. § 705(9).

377.     At all times relevant to this action, Ms. Horan had substantial limitations to the major life activity of hearing and speaking, and was an individual with a disability within the meaning of the Rehabilitation Act, 29 U.S.C. § 705(9) and Section 1557, 42 U.S.C. § 18116.

378.     At all times relevant to this action, Ms. Horan's primary language for communication was ASL and not English; and Ms. Horan had limited ability to read, write, speak, or understand English, and was an individual with limited English proficiency within the meaning of Section 1557, 45 C.F.R. § 92.4.

379.     At all times relevant to this action, Defendants received federal financial assistance, including Medicaid reimbursements, and was principally engaged in the business of providing health care. Therefore, Defendants are health programs or activities receiving federal financial assistance pursuant to 42 U.S.C. § 18116(a).

380.     Pursuant to Section 1557, "an individual shall not, on the grounds prohibited...under section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance . . ." 42 USC § 18116.

381.     Defendants have discriminated and continue to discriminate against Ms. Horan solely on the basis of Ms. Horan's disabilities and her limited English proficiency denying her meaningful access to the services, programs, and benefits Defendants offer to other individuals by refusing to provide auxiliary aids and services necessary to ensure effective communication in violation of Section 1157, 42 U.S.C. § 18116.

382.     Defendants discriminated against Ms. Horan by failing to ensure effective communication through the providing of qualified sign language interpreters.

383.     As set out above, absent injunctive relief there is a clear risk that Defendants' actions will recur again with Ms. Horan and other Deaf patients and family members.

384.     Ms. Horan is therefore entitled to seek and recover compensatory damages for the injuries and loss she sustained as a result of Defendants' intentionally discriminatory conduct as alleged, pursuant to 42 U.S.C. § 18116(a).

385.     Ms. Horan is further entitled to an award of attorney's fees, costs, and disbursements pursuant to 42 U.S.C. § 18116(a) and/or common law.

## COUNT XIX
## SECTION 504 OF THE REHABILITATION ACT OF 1973, 29 U.S.C. § 701 et seq.
**(Samantha Harry Against University Hospitals Health System, Inc.; University Hospitals Medical Group, Inc.; University Hospitals Cleveland Medical Center; and University Primary Care Practices, Inc.)**

386.     Plaintiff Samantha Harry incorporates by reference the allegations from the preceding paragraphs, as if fully re-alleged herein.

387. Ms. Harry is Deaf and her disability substantially limits one or more of her major life activities, including her ability to effectively communicate with others who are not fluent in ASL.

388. Ms. Harry is therefore considered to be an individual with a disability under Section 504 of the Rehabilitation Act, as amended.

389. University Hospitals is a recipient of federal financial assistance by virtue of receipt of Medicare and Medicaid payments, as well as other financial assistance.

390. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, requires that no qualified individual with a disability, on the basis of that disability, be excluded from participation in or be denied the benefit of the services, programs, activities, or to be otherwise discriminated against.

391. The doctors, nurses, and all other employees and staff of University Hospitals who interacted with Ms. Harry had actual knowledge of her disability, yet, Ms. Harry was consistently denied any form of effective communication.

392. Accordingly, University Hospitals discriminated against Ms. Harry in the equal use of its facilities, and as a result, Ms. Harry experienced mental anguish and humiliation in violation of her civil rights.

393. University Hospitals failed to provide services to Ms. Harry as it would have provided a similarly situated hearing patient.

394. University Hospitals' policies, practices, and procedures, particularly the actions and omissions described above, violated Ms. Harry's rights under Section 504 of the Rehabilitation Act by discriminating on the basis of a disability.

395.    University Hospitals has discriminated against Ms. Harry by failing to provide auxiliary aids and services necessary to ensure effective communication with individuals who are Deaf or hard of hearing in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

396.    At all times material, the employees, staff, and agents of University Hospitals would have been able to communicate effectively with Ms. Harry if University Hospitals had provided qualified interpreter services.

397.    University Hospitals staff knew that Ms. Harry would be harmed by their failure to provide an interpreter.

398.    As a result of University Hospitals' actions, Ms. Harry has been damaged and experienced emotional suffering, pain, and anguish.

399.    University Hospitals actions were intentional, with reckless disregard, and with deliberate indifference to the rights and needs of Ms. Harry.

**COUNT XX**
**TITLE III OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12181 et seq.**
**(Samantha Harry Against University Hospitals Health System, Inc.; University Hospitals Medical Group, Inc.; University Hospitals Cleveland Medical Center; and University Primary Care Practices, Inc.)**

400.    Plaintiff Samantha Harry incorporates by reference the allegations from the preceding paragraphs, as if fully re-alleged herein.

401.    Ms. Harry's hearing loss substantially limits her major life activities, including her ability to effectively communicate.

402.    Ms. Harry is an individual with a disability under Title III of the Americans with Disabilities Act.

403.    Ms. Harry meets the essential eligibility requirements for Defendants' services at all times material hereto.

404.    Ms. Harry will likely return to University Hospitals premises in the near future and will be harmed by University Hospitals' discriminatory policies and procedures.

405.    University Hospitals violated Title III of the Americans with Disabilities Act in numerous ways, including discriminatory actions which occurred when University Hospitals:

    a.  Failed to maintain policies and procedures to ensure compliance with Title III of the Americans with Disabilities Act, specifically policies that provide equal access and effective communication to individuals with disabilities, 28 C.F.R. § 36.303(a) (2010);

    b.  Failed to ensure that communications with Ms. Harry was as effective as communications with non-disabled patients, 28 C.F.R. § 36.303(a) (2010);

    c.  Failed to provide auxiliary aids and services, including a qualified interpreter, and to modify policies and procedures to prevent discrimination against Plaintiff, 28 C.F.R. § 36.303(a) (2010), 28 C.F.R. § 36.302(a) (2010);

    d.  Excluded Ms. Harry from services of the public entity and denied Ms. Harry the benefit of these services due to her disabilities, 28 C.F.R. § 36.202(a) (2010).

406.    University Hospitals had knowledge of its obligations under the Americans with Disabilities Act and was deliberately indifferent to the rights of Ms. Harry.

407.    University Hospitals knew that Ms. Harry would be harmed by their failure to provide an interpreter.

## COUNT XXI
## SECTION 1557 OF THE PATIENT PROTECTION AND AFFORDABLE CARE ACT, 42 U.S.C. § 18116
### (Samantha Harry Against University Hospitals Health System, Inc.; University Hospitals Medical Group, Inc.; University Hospitals Cleveland Medical Center; and University Primary Care Practices, Inc.)

408.    Plaintiff Samantha Harry incorporates by reference the allegations from the preceding paragraphs, as if fully re-alleged herein.

409.    At all times relevant to this action, Section 1557 of the Patient Protection and Affordable Care Act ("Section 1557"), was in full force and effect and applied to the Defendants' conduct.

410.    At all times relevant to this action, Section 1557, 42 U.S.C. § 18116, incorporated the definition of disability in the Rehabilitation Act, 29 U.S.C. § 705(9).

411.    At all times relevant to this action, Ms. Harry had substantial limitations to the major life activity of hearing and speaking, and was an individual with a disability within the meaning of the Rehabilitation Act, 29 U.S.C. § 705(9) and Section 1557, 42 U.S.C. § 18116.

412.    At all times relevant to this action, Ms. Harry's primary language for communication was ASL and not English; and Ms. Harry had limited ability to read, write, speak, or understand English, and was an individual with limited English proficiency within the meaning of Section 1557, 45 C.F.R. § 92.4.

413.    At all times relevant to this action, Defendants received federal financial assistance, including Medicaid reimbursements, and was principally engaged in the business of providing health care. Therefore, Defendants are health programs or activities receiving federal financial assistance pursuant to 42 U.S.C. § 18116(a).

414.    Pursuant to Section 1557, "an individual shall not, on the grounds prohibited...under section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance . . ." 42 USC § 18116.

415.    Defendants have discriminated and continue to discriminate against Ms. Harry solely on the basis of Ms. Harry's disabilities and her limited English proficiency denying her meaningful access to the services, programs, and benefits Defendants offer to other individuals by refusing to provide auxiliary aids and services necessary to ensure effective communication in violation of Section 1157, 42 U.S.C. § 18116.

416.    Defendants discriminated against Ms. Harry by failing to ensure effective communication through the providing of qualified sign language interpreters.

417.    As set out above, absent injunctive relief there is a clear risk that Defendants' actions will recur again with Ms. Harry and other Deaf patients and family members.

418.    Ms. Harry is therefore entitled to seek and recover compensatory damages for the injuries and loss she sustained as a result of Defendants' intentionally discriminatory conduct as alleged, pursuant to 42 U.S.C. § 18116(a).

419.    Ms. Harry is further entitled to an award of attorney's fees, costs, and disbursements pursuant to 42 U.S.C. § 18116(a) and/or common law.

**WHEREFORE,** Plaintiffs respectfully pray that this Court grant the following relief against Defendants, including entering a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that the Defendants' practices, policies, and procedures have subjected Plaintiffs to discrimination in violation of Section 504 of the Rehabilitation Act and Title III of the Americans with Disabilities Act, and permanently enjoin the Defendants from any practice, policy, and/or procedure which will deny Plaintiffs equal access to and benefit from the

Defendants' services, or which deny Plaintiffs effective communication with the Defendants. This includes entering a permanent injunction ordering the Defendants:

    a.  To immediately begin providing Plaintiffs with interpreters to ensure they receive adequate healthcare for any other medical issues;

    b.  To cease discrimination against Plaintiffs and all other Deaf or hard of hearing patients;

    c.  To promulgate and comply with policies and procedures to ensure that the Defendants and their staff do not discriminate against individuals who are Deaf and hard of hearing;

    d.  To promulgate and comply with procedures to ensure that the Defendants will provide and pay for interpreter services when needed by individuals who are Deaf or hard of hearing in all services offered by the Defendants;

    e.  To promulgate and comply with procedures to ensure that the Defendants will notify individuals who are Deaf or hard of hearing of their right to effective communication. This notification will include posting explicit and clearly worded notices that state that the Defendants will provide ASL interpreters and/or other communication services that ensure effective communication with Deaf or hard of hearing persons;

    f.  Award compensatory damages to Plaintiffs;

    g.  Award reasonable costs and attorneys' fees; and

h.  Award any and all other relief that may be necessary and appropriate.

Respectfully Submitted,


/s/ *Sean H. Sobel*
Sean H. Sobel (0086905)
Sobel, Wade & Mapley, LLC
2460 Fairmount Boulevard, Ste 314
Cleveland, Ohio 44106
T: (216) 223-7213
F: (216) 223-7213
sobel@swmlawfirm.com


/s/ *Andrew November*
Andrew November (0085018)
Liner Legal, LLC
4269 Pearl Road, Ste 104
Cleveland, Ohio 44107
T: (216) 282-1773
F: (216) 920-999
anovember@linerlegal.com

*Attorneys for Plaintiffs*

## **JURY DEMAND**

Plaintiffs demand a trial by jury by the maximum number of jurors permitted.


/s/ *Sean H. Sobel*
Sean H. Sobel (0086905)
*Attorney for Plaintiffs*